SCALTECH, INC., Plaintiff–Appellant,

v.

RETEC/TETRA, LLC., Defendant–Cross Appellant.

Nos. 01–1005, 01–1009.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 23, 2001.

Rehearing and Rehearing En Banc Denied Dec. 14, 2001.

---

Robert M. Hardy, Jr., of Houston, TX, argued for plaintiff-appellant. Of counsel on the brief was Jeffrey W. Tayon, Conley, Rose & Tayon, P.C. Of counsel was Robert M. Gray, Conley, Rose & Tayon, P.C. of Houston, TX.

David J. Brody, Hamilton, Brook, Smith & Reynolds, P.C., of Lexington, MA, argued for defendant-cross appellant. With him on the brief was Deirdre E. Sanders.

Of counsel on the brief was Lawrence B. Schreve, Andrews & Kurth L.L.P., of Houston, TX.

Before RADER, BRYSON and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents the question whether the claims of U.S. Patent No. 5,443,717 (the " '717 patent") are invalid under 35 U.S.C. § 102(b) because the claimed invention was offered for sale more than one year before the filing of the patent application. We affirm the district court's decision granting summary judgment of invalidity.

## BACKGROUND

### I. '717 Patent

Scaltech, Inc. ("Scaltech") is in the business of recycling industrial waste produced during the refining of petroleum products. Retec/Tetra, L.L.C. ("Retec") is in the business of producing delayed coker quench streams for use in producing coke. Their paths crossed when they both used waste products from the petroleum refinery process to produce coke.

Scaltech is the assignee of the '717 patent, entitled "Recycle of Waste Streams." The '717 patent issued on August 22, 1995, pursuant to the January 19, 1993, application of Robert M. Scalliet, et al. Mr. Scalliet is also the founder of Scaltech. Retec is the alleged infringer of the '717 patent.

The '717 patent describes a process for treating oil refinery waste by introducing the waste into the coking process, which oil refiners use to produce coke. '717 patent, col. 2, ll. 52–58. Coke is a porous solid or charcoal-like residue that is frequently burned as a fuel. However, this substance also plays an important role in

successful disposal of refinery waste. The delayed coking process involves heating crude oil residue and subjecting it to specific process conditions in a coker drum. The final product, coke, is subsequently quenched or cooled by introducing an aqueous slurry of solids, or the quench stream, into the coker drum. Typical waste products that are successfully disposed of in the quench stream include oily sludges, slop oil emulsion solids, and dissolved air flotation ("DAF") float. *Id.,* col. 3, ll. 36–43. DAF waste is of particular importance here.

In 1975, the Mobil Oil Company ("Mobil") developed a process to dispose of refinery waste by injecting it into the coke bed during the quench cycle. During the delayed coking process, the solid waste and any organic liquids become dispersed throughout the coke mass. The combustible portion of the sludge becomes part of the coke. Aptly named the Mobil Oil Sludge Conversion process, or the MOSC process, Mobil obtained U.S. Patent No. 3,917,564 (the "Meyers patent") on the process. After issuance of the Meyers patent, U.S. Patent Nos. 4,874,505 and 5,009,767 (collectively, the "Bartilucci patents") were issued to Mobil and described a treatment process similar to that of the Meyers patent, but which separated the refinery waste into two streams: high oil content and high water content. The Bartilucci patents teach the injection of the high oil content waste stream into the coker drum during the coking cycle, so that there will be sufficient heat to flash off the oily waste. The high water content stream should be introduced to the coker during the quench cycle. The process described in the Bartilucci patents allows the coker to process increased amounts of refinery waste. Although the Meyers and Bartilucci patents represent a significant step forward in disposing of refinery waste, there are still disadvantages to these processes, including a significant loss of oil because it is not removed before the coking process takes place and oily build-up in the coke drum. '717 patent, col. 2, ll. 21–26. The '717 patent attempts to solve both of these problems.

The '717 patent teaches a desirable technique for treating the waste stream, before it is introduced into the coker drum, using a centrifuge, such as a Guinnard DC–6 vertical disk centrifuge ("DC–6 centrifuge"), to separate the waste stream into organic (oil), aqueous, and solids fractions. *Id.,* col. 5, ll. 38–55. This separation process is the first step in increasing the concentration of solids. If the solids portion contains too much water, the wet sediment can be further processed by filtering out additional water to increase the concentration of solids and produce the coker quench stream. *Id.* at ll. 58–61. The content of the quench stream after separation is approximately 5–35% by weight solids, less than 6% by weight mobile organics, and water. *Id.,* col. 2, ll. 52–58. Before entering the coker drum, the quench stream frequently will enter a storage tank where uniformity of the stream is maintained. *Id.,* col. 6, ll. 27–31. Lastly, the coker quench stream, consisting of a high solids concentration and a small particle size, and the primary quench stream are introduced into the coker drum. *Id.,* col. 5, ll. 62–64.

One advantage of the '717 patent is that it enables processing of a significantly larger amount of waste. As the '717 patent teaches, increased quantities of refinery waste may be successfully disposed of in the quench stream of the coker unit when this stream has a high solids concentration, and the particle sizes of greater than 70% of the solids in the stream have been reduced to less than 15 microns. *Id.,* col. 5, ll. 10–23. As the specification indicates, the separation and dewatering processes increase the concentration of solids.

The specification further discusses the possibility of attrition (reduction of particle size) using either grinding mechanisms or a centrifuge. *Id.,* col. 5, ll. 31–46.

Claims 1 and 6 are the only independent claims in the '717 patent. Claim 1 reads as follows:

1. In a process for producing delayed petroleum coke, wherein a liquid hydrocarbon feed stream is introduced into a delayed coking vessel under delayed coking conditions and the coke produced is quenched, the improvement comprising:

 treating a waste stream containing water, organic compounds and solids so as to cause attrition of said solids to produce a delayed coker quench stream containing from about 5 to about 35% by weight solids, water and less than about 6% by weight mobile organics, said solids in said coker quench stream having a particle size distribution such that greater than about 70% of the total solids volume comprises solids having a particle size of less than about 15 microns; and introducing said coker quench stream into said coking vessel during quenching.

*Id.,* col. 8, line 54—col. 9, line 2.

Claim 6 reads:

6. A process for producing a delayed coker quench stream for use in producing delayed petroleum coke wherein a liquid hydrocarbon feed stream is introduced into a delayed coking vessel under delayed coking conditions and the coke produced is quenched comprising:

 treating a waste stream containing water, organic compounds and solids so as to cause attrition of said solids to produce a delayed coker quench

stream containing from about 5 to about 35% by weight solids, water and less than about 6% by weight mobile organics, said solids in said coker quench stream having a particle size distribution such that greater than about 70% of the total solids volume comprises solids having a particle size of less than about 15 microns.

*Id.,* col. 9, line 16—col. 10, line 8.

II. *Scaltech's Activities Before the Critical Date*

██ Retec challenged the validity of the claims of the '717 patent under the on sale bar rule.[1] A claimed invention is considered to be on sale within the meaning of § 102(b) if the claimed invention is offered for sale more than one year before the filing date of the patent application. Here, the critical date is January 19, 1992, which is one year before the filing date of the '717 patent application. The following facts are relevant to the on sale determination.

In 1987, Scaltech began treating refinery waste at Chevron. Chevron wished to dispose of its refinery waste by injecting it into the coking process, and it turned to Scaltech for advice on how to improve its disposal process. Mr. Scalliet, the named inventor of the '717 patent and the founder of Scaltech, suggested that excess oil in the waste might be clogging the coke pores and preventing effective disposal of all of Chevron's· hazardous waste. Mr. Scalliet offered to use a DC–6 centrifuge to separate the oil from the waste and to provide loads of de-oiled waste to Chevron, so that Chevron could test Mr. Scalliet's theory, even though Scaltech was not going to participate in the testing. Following Scaltech's suggestions yielded positive results for Chevron.

---

1. While the parties focus on independent claims 1 and 6, Scaltech makes no attempt to argue that the dependent claims require any different treatment.

After hearing from third parties about the success at Chevron, Scaltech attempted to duplicate the success on its own. Between 1988 and 1991, Scaltech offered to test the process at six different refineries. Its offers to two of the refineries, Chevron and Champlin Refining Company ("Champlin"), in particular, are alleged to create the on sale bar under § 102(b). In its March 30, 1988, proposal to Chevron and its November 18, 1988, proposal to Champlin, Scaltech offered to process all of the waste generated by the oil refining process including the small particle size, DAF float waste. Scaltech did not indicate that it would control the solids concentration in the quench stream or the particle size of the solid waste. However, the parties agree that the DAF waste satisfied the particle size limitations of the patent. Scaltech also admits in its reply brief that "[t]he DC–6 will inherently produce a solids slurry within the '717 [p]atent claim specifications for high solids content DAF float."

III. *Prior Proceedings*

Scaltech sued Retec for patent infringement of all the claims of the '717 patent in the United States District Court for the Southern District of Texas. Retec raised the affirmative defense of patent invalidity under 35 U.S.C. §§ 102(b), 103 and 112. Retec moved for summary judgment on the grounds of invalidity. In the first district court opinion, the district court granted a motion for summary judgment in favor of Retec because it found that an embodiment of the claimed invention was offered for sale to Chevron and Champlin in 1988. However, in granting this motion, the district court did not analyze whether the process on sale inherently satisfied each claim limitation. Scaltech appealed to this court. This court's initial opinion was published at *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 156 F.3d 1193, 48 USPQ2d 1037 (Fed.Cir.1998) (*Scaltech I*) and was amended and reissued at 178 F.3d 1378, 51 USPQ2d 1055 (Fed.Cir.1999) (*Scaltech II*) following the Supreme Court's decision in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d 1641 (1998). The question on appeal in *Scaltech II* was whether the claimed invention was offered for sale within the meaning of § 102(b). We vacated the district court's judgment of invalidity and remanded for further proceedings. We concluded that the district court erred because "[t]he record does not indicate whether an embodiment of the claimed invention was offered for sale." *Id.* at 1383. To properly address this issue, we held that the district court was required to examine whether the process offered in the 1988 proposals to Chevron and Champlin satisfied all the claim limitations regarding the high solids concentration and the small particle size. Specifically, Retec was required to show that the process "offered for sale inherently possessed each of the claim limitations," *Scaltech II*, 178 F.3d at 1384, though it was not necessary to show the seller appreciated all of the claimed characteristics of the invention. *Id.* at 1383–84.

On remand, the district court *sua sponte* granted summary judgment on the existing record, concluding that both the 1988 Chevron and Champlin proposals offered a process that inherently satisfied the claim limitations regarding a high solids concentration and small particle size. According to the court, both Mr. Scalliet and Mr. Koopersmith admitted that the DC–6 centrifuge in its normal operation inherently reduces the size of the particles to the size claimed in the '717 patent. The court found that this attrition occurs through the ejection of the solid particles against a cast iron shield, and that because the 1988 offers embodied the claimed invention, the process was reduced to practice in 1988. *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, No.

H–95–4190, slip op. at 17–19 (S.D.Tex. Sept. 8, 2000). Therefore, the district court once again invalidated the claims of the patent under 35 U.S.C. § 102(b).[2]

Scaltech again timely appealed to this court. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

### I. *Standard of Review*

■ The determination of whether an invention was on sale within the meaning of § 102 is a question of law that we review without deference. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 249 F.3d 1307, 1310, 58 USPQ2d 1723, 1725 (Fed. Cir.2001). Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review a grant of summary judgment without deference. *See Crater Corp. v. Lucent Techs., Inc.,* 255 F.3d 1361, 1366, 59 USPQ2d 1044, 1047 (Fed.Cir.2001).

### II. *On Sale Bar*

■ The question before this court is whether the refinery waste disposal process described in the '717 patent was offered for sale within the meaning of 35 U.S.C. § 102(b) more than one year before the date of application for the patent. Though we conclude that the district court erred in its analysis, we affirm the district court's decision granting summary judgment because we conclude that the undisputed facts establish an on sale bar.

At the outset, we are confronted by Scaltech's contention that the district court decision should be reversed because it was rendered on the *Scaltech II* record, and this court in *Scaltech II* determined that the "record does not indicate whether an embodiment of the claimed invention was offered for sale." 178 F.3d at 1383. In *Scaltech II,* we did not suggest that we had reviewed the existing record in detail to determine whether it was adequate for summary judgment; we decided only that Retec had not established that the existing record required summary judgment. Moreover, we now have the benefit of the parties' agreement as to certain material facts, which we did not have in *Scaltech II.* As we describe below, we conclude that the record here is adequate for summary judgment. We also see no error in the district court's granting of summary judgment without further motions or briefing.

Section 102(b) provides: "A person shall be entitled to a patent unless ... the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The date exactly one year prior to the date of application for the patent is known as the critical date. As noted above, since the patent application was filed on January 19, 1993, the critical date here is January 19, 1992.

The Supreme Court has provided guidance in determining whether an invention can be considered on sale within the meaning of § 102(b) of the Patent Act. In the seminal case of *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 59, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d 1641, 1646–47 (1998), the patentee sued a competitor for infringement of his patent for a computer chip socket. The issue was whether the commercial marketing of the socket began the one-year period for purposes of an on sale bar, even though Pfaff's invention had not yet been reduced to practice. *Id.* The court held that there was no requirement that the invention actually have been re-

---

**2.** The district court also concluded that there was no best mode violation. In light of our disposition, we do not reach the best mode question.

duced to practice. Instead, the Court outlined a two-part test that an invention must satisfy in order for the on sale bar to apply. "First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting. [The second] condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* The Court affirmed this court's decision that the patent was invalid under § 102(b) because Pfaff's acceptance of a purchase order from a manufacturer prior to the critical date proved that a commercial offer for sale had been made and because the invention was ready for patenting as proved by the manufacturer's ability to produce the invention from the detailed drawings provided by Pfaff. *Id.* at 67–68, 119 S.Ct. 304.

## 1. *Commercial Offer for Sale of Patented Invention*

Under *Pfaff,* the first step in our analysis is determining whether there was a commercial offer for sale of the patented invention. This first step has two subparts. We must find that there was a "commercial offer" and that it was an offer of the patented invention. While neither party argues the question, we think the fact that the process itself was not offered for sale but only offered to be used by the patentee to process waste does not take it outside the on sale bar rule. The on sale bar rule applies to the sale of an "invention," and in this case, the invention was a process, as permitted by § 101. As a result, the process involved in this case is subject to § 102(b). *Cf. D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1148, 219 USPQ 13, 16 (Fed.Cir.1983) ("placing of the product of a method inven-

tion on sale more than a year before that party's application filing date must act as a forfeiture of any right to the grant of a valid patent on the method ..."). In this case, commercial exploitation was involved. Accordingly, the on sale bar rule is implicated.

### a. *Commercial Offer for Sale*

 Recently, this court has defined what constitutes an offer for sale for purposes of this statutory bar. "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1048, 59 USPQ2d 1121, 1126 (Fed.Cir.2001). This issue is governed by federal common law. *Id.* at 1047. *See also Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.,* 196 F.3d 1366, 1372, 52 USPQ2d 1801, 1805 (Fed.Cir.1999) (concluding that the need for national uniformity in patent law requires the application of federal common law). To determine if the offer is sufficiently definite, one must examine the language of a proposal in accordance with the principles of general contract law. *See Group One,* 254 F.3d at 1048. An important relevant source of general contract law for determining whether a "communication or series of communications rises to the level of a commercial offer for sale" is the Uniform Commercial Code ("UCC"). *Id.* at 1047. An offer for sale does not have to be accepted to implicate the on sale bar. *UMC Elecs. Co. v. United States,* 816 F.2d 647, 653, 2 USPQ2d 1465, 1469 (Fed.Cir.1987) (overruled on other grounds by *Pfaff,* 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998)).

The patentee's actions that trigger the statutory bar here occurred in 1988, when

Scaltech offered to process refinery waste for Chevron and Champlin Refining Company. In Scaltech's March 30, 1988, proposal to Chevron, Scaltech offered to process the oily sludges and "return clean oil, water and a deoiled wet solid slurry suitable to be sent to the coker." The accompanying formal proposal documents of September 8, 1988, indicated that the "quotation is based on one centrifuge," and that "[t]his offer is firm for 90 days." Likewise, in its November 15, 1988, proposal to Champlin Refining Company, Scaltech's proposal repeated the above phrases regarding the quotation and the duration of the offer. Neither proposal was accepted. However, Scaltech's unsuccessful offers to Chevron and Champlin on March 30, 1988, and November 15, 1988, respectively, provide sufficiently definite offer language to constitute a commercial offer for sale within the meaning of the statute. So too, the mere fact that the offers, if accepted, might not have actually led to the processing of DAF waste is irrelevant to the scope of the offers, which included offers to process such waste.

b. *Invention Offered for Sale Satisfying All Claim Limitations*

■ As we held in *Scaltech II*, the invention that is the subject matter of the offer for sale must satisfy each claim limitation of the patent, though it may do so inherently. 178 F.3d at 1383–84. *See Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1347, 51 USPQ2d 1943, 1948 (Fed. Cir.1999) (affirming the district court's finding of invalidity because the disputed claim limitation was inherent in the prior art). Inherency is established if "the natural result flowing from the operation as taught would result in the performance of the questioned function...." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1269, 20 USPQ2d 1746, 1749 (Fed.Cir. 1991). However, as we noted in *Scaltech II*, "[i]nherency may not be established by

probabilities or possibilities." 178 F.3d at 1384.

Scaltech argues, without citing any legal authority to support its position, that in order for the invention to be inherent in the process offered, the evidence must show that for all typical applications, each of the claim limitations would have been present. Scaltech further contends that because the offered process did not achieve the reduced particle size and the high solids concentration for some types of waste, there is insufficient evidence to implicate the statutory bar. The district court disagreed with Scaltech and concluded that both the Chevron and Champlin proposals offered a process that inherently satisfied the claim limitations relating to small particle size and high solids concentration. Specifically, the district court concluded that the DC–6 centrifuge inherently reduced the size of the solid particles by ejecting the slurry of solids at a high velocity into a cast iron shield.

The parties agree about the effect of the DC–6 centrifuge on the solids concentration. As Scaltech concedes in its reply brief to this court, "[t]he DC–6 will inherently produce a solids slurry within the '717 [p]atent claim specifications for high solids content DAF float." Therefore, the 1988 offers embodied the high solids concentration claim limitation for certain types of DAF float waste. Scaltech also admits that the DC–6 centrifuge will always generate a de-oiled waste stream containing less than 6% free oil by weight, which satisfies the low oil content claim limitation of the '717 patent.

However, the district court's reasoning with respect to the particle size limitation reflected a misunderstanding of the record regarding the effect of the DC–6 centrifuge on the particle size of the waste. There is a genuine factual dispute as to whether the use of the DC–6 centrifuge

reduces the particle size sufficiently to satisfy the claim limitations for waste other than DAF float waste, which already has a small particle size. And unlike the description of the invention in the patent, the 1988 offers to Chevron and Champlin did not propose to reduce the particle size of the waste by use of either grinding mechanisms or the DC–6 centrifuge. Thus, there is a genuine issue of material fact as to whether the 1988 offers embodied the particle size claim limitation for wastes other than DAF waste.

■ But, it is not necessary for Retec to show that all embodiments of the invention were on sale more than one year before filing. It is sufficient to show that one embodiment of the invention was offered for sale during the one-year period. *See Titanium Metals Corp. of Am. v. Banner,* 778 F.2d 775, 782, 227 USPQ 773, 779 (Fed.Cir.1985) ("It is also an elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art."); *Atlas Powder Co.,* 190 F.3d at 1346 (indicating that "when a patent claims a chemical composition in terms of ranges of elements, any single prior art reference that falls within each of the ranges anticipates the claim"). Retec has done this by showing that: (1) Scaltech offered to process DAF float waste, which satisfied the particle size claim limitation; and (2) Scaltech used the DC–6 centrifuge, which inherently produced a high solids concentration for high solids content DAF float and a low oil content waste stream. Indeed, the parties agree that Scaltech offered to treat DAF float, and that the treatment of DAF float waste using the process offered in 1988 would have satisfied the claim limitations.

■ Scaltech argues that the 1988 offers to Chevron and Champlin to process DAF float waste, would have been only an "accidental and unwitting" duplication of the invention, relying on the Supreme Court's decision in *Tilghman v. Proctor,* 102 U.S. 707, 26 L.Ed. 279 (1880). Scaltech did not appreciate in 1988 that applying its process to small particle size waste, such as DAF float, would allow the processing of larger amounts of waste than was previously thought feasible. When Scaltech did appreciate this in the summer of 1992, shortly thereafter, on January 19, 1993, it applied for a patent. However, as we held in *Scaltech II* and previous cases, appreciation of the invention is not a requirement to trigger the statutory bar. "If the process that was offered for sale inherently possessed each of the claim limitations, then the process was on sale, whether or not the seller recognized that his process possessed the claimed characteristics." *Scaltech II,* 178 F.3d at 1383–84. *See Gen. Elec. Co. v. Jewel Incandescent Lamp Co.,* 326 U.S. 242, 248, 66 S.Ct. 81, 90 L.Ed. 43, 67 USPQ 155, 157–58 (1945) (holding a patent invalid when "the prior art discloses the method of making an article having the characteristics of the patented product, though all the advantageous properties of the product had not been fully appreciated"); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1548, 220 USPQ 303, 309 (Fed.Cir.1983) (holding that it is irrelevant to the determination of anticipation whether those using the invention appreciated the results because "[w]ere that alone enough to prevent anticipation, it would be possible to obtain a patent for an old and unchanged process"), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). *See also Abbott Labs. v. Geneva Pharms., Inc.,* 182 F.3d 1315, 1319, 51 USPQ2d 1307, 1309 (Fed.Cir.1999) (stating that the "accidental and unwitting" cases are only applicable when the claimed invention is "anticipated by earlier work that produced no useful or appreciated result"), *cert. denied,* 528 U.S.

1078, 120 S.Ct. 796, 145 L.Ed.2d 671 (2000). Therefore, although Scaltech may not have recognized either the workings of its invention or its full potential in 1988, the invention was still offered for sale within the meaning of § 102(b).

2. *Ready for Patenting*

The second step in our analysis is determining whether the invention was ready for patenting. As previously mentioned, this can be proved by (1) reduction to practice or (2) a showing that the inventor's drawings or descriptions enabled someone skilled in the art to practice the invention. *See Pfaff,* 525 U.S. at 67–68, 119 S.Ct. 304.

Scaltech argues that under *Pfaff,* an invention cannot be ready for patenting until the inventor has conceived of each of the claim limitations of the patent. Since the importance of the small particles in the quench stream was not recognized until after the critical date, Scaltech urges that the invention was not ready for patenting.

Scaltech asserts that it could not have reduced the invention to practice before it even conceived of the claim limitations in the summer of 1992. *See Mycogen Plant Sci., Inc. v. Monsanto Co.,* 252 F.3d 1306, 1314, 58 USPQ2d 1891, 1895–96 (Fed.Cir. 2001) (indicating that, in general, one must appreciate the limitations of the claimed invention in order to reduce it to practice). However, we have held that where an invention is on sale, conception is not required to establish reduction to practice. *Abbott Labs.,* 182 F.3d at 1318–19. As we specifically held in *Abbott Laboratories,* "[t]he sale of the [invention] in question obviates any need for inquiry into conception." *Id.* Although neither party in this case accepted the offer for sale, the *Abbott Laboratories* rule applies.

In any event, the invention also was ready for patenting before the critical date of January 19, 1992, because the inventor had prepared drawings or a description sufficient for enablement. *See Pfaff,* 525 U.S. at 68–69, 119 S.Ct. 304 (identifying this second approach to ready for patenting); *Weatherchem Corp. v. J.L. Clark, Inc.,* 163 F.3d 1326, 1334, 49 USPQ2d 1001, 1006 (Fed.Cir.1998) (confirming that an invention can be ready for patenting before it is reduced to practice). As Retec points out, the 1991 MOSC Efficiency Booster Document used to persuade CITGO to accept Scaltech's offer to treat its hazardous waste provides a description sufficient to satisfy the aforementioned requirement. This document was available well before the critical date of January 19, 1992, and is essentially a "recipe" that describes how to process DAF float, which allows CITGO to practice an embodiment of the invention.

Therefore, both prongs of the *Pfaff* test are satisfied, and all the claims of the '717 patent are invalid under § 102(b) of the Patent Act. In light of our disposition, Scaltech's contentions regarding a jury trial, consolidation, and the bifurcation order are moot.

## CONCLUSION

For the foregoing reasons, we affirm the district court's decision granting summary judgment of invalidity.

No costs.