NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**EQUISTAR CHEMICALS, LP, MSI TECHNOLOGY LLC,**
*Plaintiffs-Appellants*

**v.**

**WESTLAKE CHEMICAL CORPORATION,**
*Defendant-Cross-Appellant*

---

2017-1548, 2017-1549

---

Appeals from the United States District Court for the Eastern District of Texas in No. 6:14-cv-00068-KNM, Magistrate Judge K. Nicole Mitchell.

---

Decided: July 3, 2018

---

MICHAEL A. BITTNER, Winston & Strawn LLP, Dallas, TX, argued for plaintiffs-appellants. Also represented by THOMAS M. MELSHEIMER; ROBERT P. COURTNEY, CONRAD GOSEN, Fish & Richardson P.C., Minneapolis, MN.

DARYL JOSEFFER, King & Spalding LLP, Washington, DC, argued for defendant-cross-appellant. Also represented by JOHN HANSON BARR, JR., JEFFREY L. OLDHAM,

RICHARD WHITELEY, STACIANNE WILSON, Bracewell LLP, Houston, TX.

———————————

Before DYK, MOORE, and O'MALLEY, *Circuit Judges.*

DYK, *Circuit Judge.*

Equistar Chemicals, LP and MSI Technology, LLC (collectively "Equistar") brought suit for infringement of U.S. Patent No. 7,064,163 ("the '163 patent") against Westlake Chemical Corporation ("Westlake") in the District Court for the Eastern District of Texas. Westlake asserted various counterclaims of invalidity. We *affirm* the judgment of noninfringement and the judgment of no invalidity with respect to anticipation and obviousness. We *vacate* the grant of summary judgment rejecting the on-sale bar defense, and *remand* for further proceedings.

## BACKGROUND

Adhesive resins are used to bind different layers of polymers together. In food packaging, for example, adhesive resins bind a layer of ethylene vinyl alcohol, which serves as an oxygen barrier, between two layers of food-safe polyethylene. The asserted claims cover a method for producing adhesive resins. This process requires first making a polymer called a polyolefin. Then, the polyolefin is mixed with other ingredients, such as a graft polymer, in a heated mixer, which creates an adhesive resin. Equistar asserted independent claim 1 and dependent claims 2, 9, and 10, and Westlake asserted various invalidity counterclaims. Claim 1, which is representative, reads:

> 1. A method for producing improved polyolefin-based adhesive resin, comprising:
>
> a. polymerizing a monomer composition of at least one olefin to a pelletizable polyolefin;

b. mixing with shear mixing, while minimizing cross-linking, at least 50% by weight based on the polyolefin-based adhesive resin of the polymerization product following polymerization without first pelletizing the pelletizable polyolefin with at least one graft polymer or copolymer in a heated mixing device at a temperature above the melting point of the components; and

c. recovering the resulting polyolefin-based adhesive resin.

'163 pat., col. 8, ll. 28–40.

Of relevance to this dispute, all the asserted claims require that the accused process "minimize cross-linking." Cross-linking refers to a phenomenon where polymer chains link with each other during the production of organic compounds. Cross-linking is problematic in the manufacture of adhesive resins because it can cause poor performance, clarity, and color. The claims also require mixing "following polymerization without first pelletizing the pelletizable polyolefin." '163 pat., col. 8, ll. 35–36. In prior manufacturing processes, the polymer was extruded into pellets and moved to a separate production facility before proceeding to the next step. These two limitations are the only limitations disputed.

Before trial, the district court granted Equistar's motion for summary judgment of no invalidity with respect to the on-sale bar defense. At trial, the jury determined that Westlake had not infringed the asserted claims and that Westlake had not established that the asserted claims were anticipated or obvious. After trial, both parties filed judgment as a matter of law ("JMOL") motions. Equistar also filed a Rule 60(b)(3) motion, contending that Westlake's expert made misrepresentations in his testimony. The district court denied the parties' JMOL

motions and Westlake's Rule 60(b)(3) motion and entered judgment. Equistar appeals the judgment of no infringement, and Westlake cross-appeals the judgment of no invalidity. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

I

We first consider the judgment of noninfringement. In this respect, Equistar contends that the district court erred in denying its Rule 60(b)(3) motion. Federal Rule of Civil Procedure 60(b)(3) provides that the court may relieve a party from a final judgment for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."

We review the denial of the Rule 60(b) motion for abuse of discretion. *Bailey v. Cain*, 609 F.3d 763, 767 (5th Cir. 2010). Equistar argues that the evidence that Westlake's expert presented to the jury misrepresented Westlake's typical production process by falsely stating that a particular production run was representative. Equistar makes this argument based on documents that Westlake produced during discovery long before trial. There was no newly discovered evidence. Equistar had all of the documents before it, and cross-examined the witness. Equistar extensively argued to the jury that the production evidence Westlake relied upon was not representative. The jury then assessed credibility. There is no basis for granting a Rule 60(b) motion or for second-guessing the jury. As the district court concluded, "[a]t best, the allegations here amount to inconsistencies or discrepancies in the evidence. There is no evidence of forgery, lies or perjury." J.A. 9. The district court did not abuse its discretion in denying Rule 60(b) relief.

Equistar alternatively argues that either JMOL or a new trial is warranted because the jury verdict was not supported by substantial evidence. We review the denial of JMOL de novo. *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016). We review the denial of a new trial for abuse of discretion. *Id.* Here, the jury's verdict is supported by substantial evidence. The only disputed limitation is whether the accused process "minimizes cross-linking." Westlake's expert testified that Westlake's production process does not minimize cross-linking because it exposes its products to higher temperatures and introduces oxygen, both of which cause cross-linking. Westlake further provided evidence that rather than minimizing cross-linking during the process, it removes cross-linking after the process has occurred. This is sufficient evidence to support a jury verdict that Equistar did not prove non-infringement. Thus, the district court did not err in denying JMOL and the motion for a new trial.

## II

The jury found that Westlake had not proven by clear and convincing evidence that any of the asserted claims was invalid as anticipated or obvious. Westlake argues that the district court erred in denying its JMOL motion.

Westlake argues that the record established that the asserted claims were anticipated as a matter of law by U.S. Patent No. 5,705,565, referred to as "Hughes." The parties only dispute whether Hughes discloses the "minimizing cross-linking" and the "following polymerization" limitations. Equistar's witness, Dr. Mirabella, testified at trial that Hughes does not disclose the limitation of "minimizing cross-linking" because Hughes only disclosed minimizing cross-linking with respect to making graft polymers, which are different than adhesive resins. The '163 patent, in contrast, only claims minimizing cross-linking while making adhesive resins. Dr. Mirabella

testified that graft polymers are produced using different chemicals and different processes than adhesive resins. Based on this evidence, a reasonable jury could conclude that Hughes did not disclose "minimizing cross-linking" when making adhesive resins.

As to the "following polymerization" limitation, Dr. Mirabella testified that Hughes does not disclose mixing a graft polymer and a polyolefin "following polymerization without first pelletizing" the polyolefin because a person of ordinary skill would understand "following polymerization" to require a single, continuous process. Dr. Mirabella testified that Hughes does not disclose a single, continuous process. Based on this testimony, a reasonable jury could conclude that Hughes does not disclose the "following polymerization" limitation. Therefore, the jury verdict that Westlake did not prove anticipation is supported by substantial evidence.

Westlake also argues that the asserted claims were obvious in view of Hughes or U.S. Patent No. 5,969,050, referred to as "Vandevijver." Both Hughes and Vandevijver disclose minimizing cross-linking with respect to making graft polymers. First, Westlake argues that this disclosure renders obvious "minimizing cross-linking" while manufacturing adhesive resins. However, as noted earlier, Dr. Mirabella testified that making a graft polymer uses different chemicals and different processing conditions than making an adhesive resin. Second, Equistar's experts testified that it would be nonobvious to introduce graft polymers into the continuous manufacturing process because graft polymers react differently than other additives. In particular, the experts testified that there were concerns that introducing a graft polymer into a continuous process would cause contamination. Based on this testimony, substantial evidence supports the jury verdict that Westlake did not prove that the asserted claims would have been obvious.

In sum, we conclude that the district court did not err in denying Westlake's motion for judgment of invalidity as a matter of law as to anticipation and obviousness.

## III

Westlake argues that the district court erred in granting summary judgment of no invalidity based on the on-sale bar, and that, instead the district court should have granted summary judgment of invalidity.[1]

Equistar manufactured an adhesive resin, labeled PX3236, which could be made using either a conventional process or the patented process. It is undisputed that Equistar produced 345,000 pounds of PX3236 using the patented process prior to the critical date. However, Equistar did not fill orders with PX3236 until after the critical date, and there is no contention here that Equistar actually sold any product made by the patented process before the critical date.

Mere stockpiling of a product made by the patented process is not enough to trigger the on-sale bar. *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1377 (Fed. Cir. 2016) (en banc). Yet an offer before the critical date to sell a product made by the patented method can create an on-sale bar. *Scaltech, Inc. v. Retec/Tetra LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1148 (Fed. Cir. 1983). The primary issue is whether Equistar made an invalidating offer to sell a product made by the patented method before the critical date. Westlake also contends that under our decision in *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1162 (Fed. Cir. 2006), Equistar "performed the

---

[1]    The '163 patent was filed on July 2, 2003, so the pre-America Invents Act version of 35 U.S.C. § 102 applies.

patented method for a promise of future compensation," i.e., to enable Equistar to offer products made by the patented method before the critical date.

We conclude that the district court erred in granting summary judgment because the record is not sufficient to grant summary judgment for either side. Contrary to both parties' positions, it is readily apparent that there are disputed issues of fact. The record does not disclose the exact nature of the allegedly invalidating offers or the circumstances surrounding the offers, and we think that in this case the on-sale bar issue is best addressed on a full record. On remand, the record should be developed addressing the following questions:

1. What were the offers for sale of the product, and when were they made?

2. Did the offers require the product to be made by the patented method?

3. If the offers were accepted, was Equistar obligated to supply product made by the patented method?

4. Before the critical date, did Equistar decide to fill orders with the patented method?

5. Before the critical date, could orders be filled with products produced by the conventional process or was only product produced by the patented method available?

6. Was the product produced before the critical date by the patented method made to enable the patentee to make offers before the critical date?

In identifying these questions, we express no view as to the ultimate resolution of the merits, or even whether the answer to each question is material. The case is remanded for further proceedings, which could include

consideration of a renewed motion for summary judgment or a trial as appropriate.

## CONCLUSION

We affirm the judgment of noninfringement and the judgment of no invalidity based on anticipation and obviousness. We vacate the grant of summary judgment as to the on-sale bar defense, and remand for further proceedings.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

## COSTS

No costs.