**In re John KOLLAR.**

**Nos. 01–1640.**

United States Court of Appeals,
Federal Circuit.

April 11, 2002.

John Kollar, of Wyckoff, NJ, pro se.

John M. Whealan, Solicitor, of Arlington, VA, representing the Director of the United States Patent and Trademark Office. With him on the brief was Kristin L.

Yohannan, Associate Solicitor. Of counsel was Mark Nagumo, Associate Solicitor.

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

LOURIE, Circuit Judge.

John Kollar appeals from the final decision of the United States Patent and Trademark Office ("PTO") Board of Patent Appeals and Interferences holding the claims in Kollar's Patent Application No. 08/657,564 to be unpatentable under the on-sale bar of 35 U.S.C. § 102(b). *In re Kollar*, No. 96–C–7375 (Bd. Pat.App. & Inter. July 25, 2001) ("*Kollar III*"). Because the Board erred in determining that the process claimed in the '564 application was on sale within the meaning of § 102(b), we vacate and remand.

## BACKGROUND

The '564 application, filed on December 5, 1995, is directed to a process for preparing a dialkyl peroxide by reacting one or more alcohols and/or an olefin with a monoalkyl hydroperoxide in the presence of an effective amount of an insoluble, heterogeneous acidic catalyst and separating the reaction mixture from the catalyst. The '564 application describes the claimed process as a low-cost method of producing various dialkyl peroxides, such as di-*tert*-butyl peroxide, which in turn can be used to make, *inter alia*, ethylene glycol. Ethylene glycol is used in the manufacture of a number of commercial products, ranging from polyester fibers to mining explosives. Claim 1 of the '564 application, the only claim at issue in this appeal,[1] reads as follows:

1. A process for the preparation of a dialkyl peroxide comprising reacting one or more members selected from the group consisting of an alkylating alcohol of the formula ROH, and an olefin of the formula $(R^2)(R^{2a})C=C(R^3)(R^{3a})$, wherein R is $C_1$-$C_{10}$ alkyl, and $R^2$, $R^{2a}$, $R^3$, and $R^{3a}$ are independently selected from hydrogen and $C_1$-$C_{10}$ alkyl; with a hydroperoxide of the formula $R^1OOH$, wherein is $R^1$ is $C_1$-$C_{10}$ alkyl; in the presence of an effective amount of a substantially solid, insoluble, heterogenous [sic] acidic catalyst; followed by separation of the reaction mixture from said catalyst.

The examiner finally rejected claims 1 through 17 under § 102(b) based upon a purported sale of the invention by Kollar's assignee, Redox Technologies, Inc., a company owned and operated by Kollar, to Celanese Corporation.[2] Kollar appealed that rejection to the Board.

The Board, in an exhaustive analysis, affirmed the examiner's rejection of claims 1 through 17 under the on-sale bar of § 102(b). *In re Kollar*, No. 96–C–7375, slip op. at 47 (BPAI July 17, 2000) ("*Kollar I*"). The Board determined that a July 1, 1980, agreement between Redox and Celanese entitled "DEFINITIVE AGREEMENT" ("the Celanese Agreement") constituted a firm offer to sell embodiments of the claimed process, thus triggering the bar of § 102(b). *Id.* In the Celanese Agreement, the parties essentially agreed to share technology and coordinate their research efforts with the ultimate goal of designing and building a commercial plant

---

**1.** Because Kollar argued only that claim 1 was not barred under § 102(b) in his principal brief to the Board, and because he stated that "claims 1–17 all stand together," claim 1 is the only claim we will discuss in this appeal.

**2.** The examiner also rejected claims 1 through 17 based upon an alleged sale by Redox to ARCO Chemical Company. The Board, however, did not affirm the examiner's rejection on the basis of that transaction.

capable of implementing the claimed process to manufacture ethylene glycol. The Board determined that § 102(b) applied because Celanese received what it termed "a right to commercialize" Kollar's invention, and the necessary technical information to utilize that invention, in exchange for a series of royalty payments. *Id.* The Board further determined that the "sale" by Redox could not be considered to be experimental because there was no provision in the agreement obligating Celanese to experiment with the claimed process, and in any event Kollar admitted on the record that he had reduced the invention to practice prior to the execution of that agreement. *Id.* at 45.

Kollar thereafter filed a request for rehearing, which resulted in the Board issuing two additional opinions clarifying its rationale for affirming the examiner's rejection of claims 1 through 17. *In re Kollar*, No. 96–C–7375 (BPAI Feb. 28, 2001); *Kollar III*. In *Kollar III*, the Board further explained its rationale for concluding that the Celanese Agreement barred Kollar from obtaining a patent to the claimed process as follows:

> [A]n *embodiment of a claimed process* can be *physically represented* by a *written description in a document which* not only identifies the process but also *enables the practice of that chemical process by one of ordinary skill in the art* .... [T]he preponderance of the evidence shows that appellant ... transferred documents containing a written description of the claimed process ... [and] thus commercially exploit[ed] the claimed chemical process....

*Kollar III*, slip op. at 8, 9 (emphases added).

Kollar appeals from the Board's final decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A).

## DISCUSSION

■■■ Section 102(b) provides in relevant part that "[a] person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States...." 35 U.S.C. § 102(b) (1994). The Supreme Court established a two-prong test governing the application of the on-sale bar: "First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). The PTO bears the initial burden of demonstrating that the preponderance of the evidence establishes, *prima facie*, facts supporting the conclusion that the claimed invention was on sale within the meaning of § 102(b). *In re Brigance*, 792 F.2d 1103, 1107, 229 USPQ 988, 990 (Fed.Cir. 1986). Whether an invention is "on sale" within the meaning of § 102(b) is a question of law based on underlying factual findings. *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257, 57 USPQ2d 1699, 1702 (Fed.Cir.2001). We review legal determinations of the Board, including whether an invention was on sale before the critical date, without deference. *In re Roemer*, 258 F.3d 1303, 1307, 59 USPQ2d 1527, 1529 (Fed.Cir.2001). We review the factual findings underlying that determination for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316, 53 USPQ2d 1769, 1776 (Fed.Cir.2000).

On appeal, Kollar primarily argues that Redox's and Celanese's intended activities, as called for by the Celanese Agreement, were experimental in nature and thus do not fall within the purview of the on-sale bar of § 102(b). Kollar also contends that the invention was not ready for patenting because it had not been determined whether a commercial plant meeting the quality

specifications necessary to carry out the claimed process could be built. Finally, Kollar argues that the Celanese Agreement was merely a license and therefore did not involve the sale of a commercial embodiment of the invention.

The PTO responds that Kollar failed to carry his burden of proving that the Celanese Agreement falls within the experimental use exception to § 102(b). The PTO also contends that the claimed process was ready for patenting because Kollar admitted that it was reduced to practice at the time the Celanese Agreement was signed. Finally, the PTO argues that the Celanese Agreement constitutes a sale of the process disclosed in claim 1 because Kollar received royalty payments and licensing rights in certain Celanese technology as consideration for disclosing his process and granting Celanese the "right to commercialize" the invention.

■ We conclude that the Board erred in determining that the Celanese Agreement constituted a "sale" of the claimed invention within the meaning of § 102(b). Although the Board correctly determined that Kollar's reduction to practice of the invention rendered it "ready for patenting" under the test set forth in *Pfaff, see* 525 U.S. at 67–68, 119 S.Ct. 304, it incorrectly concluded that the invention was the subject of a "commercial offer for sale." The Celanese Agreement was entered into for the purpose of "conduct[ing] research and development ['R&D'] in the Field [which the Board properly determined includes Kollar's inventive process] ... with a goal to achieving, by the end of 5 R&D years,

Celanese approval for a commercial plant in the Field." In order to facilitate that goal, the parties agreed upon a number of provisions, the relevant portions of which are as follows: Redox agreed to disclose technical information concerning the claimed process that was to be utilized by both parties during the "R&D Phase" in exchange for a series of annual royalty payments. Celanese had the discretion to terminate the agreement at any time by giving sixty days notice to Redox, at which time Celanese would be entitled to a non-exclusive license to practice the claimed process. If, however, Celanese opted to continue the joint research effort until the "Commercial Phase" was reached, Celanese would receive an exclusive license under any issued patent "to design, engineer, construct and operate a pilot plant and one or more commercial plants, *to sell the resultant products*, and to sublicense others." (Emphasis added.) In either case, in exchange for the license, Redox was entitled to receive running royalties for products that Celanese sold that were manufactured using the claimed process, the rate of which would depend upon whether and when Celanese terminated the agreement.

■ Although the Celanese Agreement specifically contemplates that "resultant products" manufactured using the claimed process could *potentially* be sold, nowhere in the Celanese Agreement is there an indication that a product of the claimed process was actually offered for sale. Rather, that agreement constitutes a license[3] to Celanese under any future patents relating to Kollar's invention. We

---

**3.** We use the term "license" here to refer to rights under a patent, not to describe a commercial transaction arranged as a "license" or a "lease" of a product or a device that may or may not have been patented. *See Group*

*One, Ltd. v. Hallmark Cards, Inc.,* 254 F.3d 1041, 1049 n. 2, 59 USPQ2d 1121, 1129 n. 2 (Fed.Cir.2001) (distinguishing between "rights in a patent" and the "sale of an interest that entitles the purchaser to possession

have held that merely granting a license to an invention, without more, does not trigger the on-sale bar of § 102(b). *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1217, 48 USPQ2d 1010, 1019 (Fed. Cir.1998) (determining that a patent was not invalid under the on-sale bar because, *inter alia*, the conveyance of "production rights in the invention" and/or "the exclusive right to market the invention" was not "a sale or an offer to sell the devices themselves"); *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267, 229 USPQ 805, 809 (Fed.Cir.1986) (holding that an assignment of rights in an invention in exchange for a share of any proceeds from commercialization did not invalidate claims at issue because "an assignment or *sale of the rights in the invention and potential patent rights* is not a sale of 'the invention' within the meaning of section 102(b)" (emphasis added)). The "right to commercialize" the invention granted to Celanese pursuant to the agreement in the form of a license is therefore insufficient to bar the claims of the '564 application under § 102(b).

The Board cited *Mas–Hamilton* in its decision, but did not interpret that case as holding that licenses do not implicate the on-sale bar. *Kollar I* at 38 n. 2. *Mas–Hamilton* involved a patented security lock that had been the subject of a commercial transaction that took place prior to the critical date. 156 F.3d at 1216–17, 48 USPQ2d at 1019. LaGard, the patentee, offered Mosler, a third party, a license under any future patents resulting from

the invention, and in doing so presented Mosler with a prototype of the patented lock. *Id.* at 1217, 48 USPQ2d at 1019. Mosler responded by paying LaGard a sum of money for the license and the prototype, and later submitted a purchase order for additional locks that was never filled by LaGard. *Id.* We concluded in *Mas–Hamilton* that the district court was correct in determining that the invention was not "on sale" within the meaning of § 102(b) for a number of reasons. First, we agreed with the district court that any "sale" that occurred was experimental in nature because "the devices were for testing or show, only, and did not represent commercial sales of the lock even though money changed hands." *Id.* Second, we determined that the purchase order provided by Mosler "was never filled, and that no agreement was reached about the particulars of the proposed lock prior to the critical date." *Id.* Finally, and of most significance to this appeal, we agreed with the district court's conclusion that "LaGard's offer to Mosler was only an offer of either (1) *production rights* in the invention, or of (2) the *exclusive right to market* the invention to the government; *neither of which involved a sale or an offer to sell the devices themselves.*" *Id.* (emphases added).

■ Therefore, although in *Mas–Hamilton* we set forth a number of bases upon which to affirm the district court's determination that there was no on-sale bar, we squarely addressed the issue "whether Mosler was merely a potential licensee of

and use" of an embodiment of an invention that is unrelated to any patent). In certain situations, a "license" in the latter sense of the word may be tantamount to a sale (*e.g.*, a standard computer software license), whereupon the bar of § 102(b) would be triggered because "[t]he product is . . . just as immedi-

ately transferred to the 'buyer' as if it were sold." *Id.* at 1053, 59 USPQ2d at 1130 (Lourie, J., concurring). However, as explained below, a "license" that merely grants rights under a patent cannot *per se* trigger the application of the on-sale bar.

legal rights, or, rather, a potential customer of devices" in concluding that the offer of a license of patent rights did not trigger the on-sale bar. *Id.* at 1216, 48 USPQ2d at 1019. The Board in this case, although correctly stating that "[t]he 'commercial offer for sale' of an embodiment of a claimed invention is all together [sic] different than an offer to sell or assign *all* of the rights *in* the invention," *Kollar I* at 37 (citing *Moleculon Research,* 793 F.2d at 1267, 229 USPQ at 809), misread *Mas–Hamilton* as holding that "[a]n offer of *part* of the 'legal rights' in an invention" may avoid triggering the on-sale bar *only* where " '*no agreement was reached about the particulars of the [invention]* prior to the critical date,' " *id.* at 38 n. 32 (quoting *Mas–Hamilton,* 156 F.3d at 1217, 48 USPQ2d at 1019). The portion of the *Mas–Hamilton* opinion emphasized by the Board, however, concerned the unfilled purchase order, and thus it failed to recognize our determination that LaGard's offer of a license did not place the invention "on sale" within the meaning of § 102(b). The proper reading of *Mas–Hamilton,* therefore, is that the offer of a license under a patent and a description of the invention, without more, does not fall within the on-sale bar of § 102(b).

<span style="background:black"></span> The Board also erred in failing to recognize the distinction between a claim to a product, device, or apparatus, all of which are tangible items, and a claim to a process, which consists of a series of acts or steps. A tangible item is on sale when, as we held in *Group One,* the transaction "rises to the level of a commercial offer for sale" under the Uniform Commercial Code. 254 F.3d at 1047, 59 USPQ2d at 1126. When money changes hands as a result of the transfer of title to the tangible item, a sale normally has occurred. A

process, however, is a different kind of invention; it consists of acts, rather than a tangible item. It consists of doing something, and therefore has to be carried out or performed.

A process is thus not sold in the same sense as is a tangible item. "Know-how" describing what the process consists of and how the process should be carried out may be sold in the sense that the buyer acquires knowledge of the process and obtains the freedom to carry it out pursuant to the terms of the transaction. However, such a transaction is not a "sale" of the invention within the meaning of § 102(b) because the process has not been carried out or performed as a result of the transaction. The same applies to a license to a patent covering a process. The Board in this case failed to recognize this distinction, and therefore erred in concluding that the license to the process under any future patents, and the accompanying description of that process, constituted a sale of the subject matter of those patents, *viz.,* the process.

<span style="background:black"></span> The Board's failure to recognize this distinction is demonstrated by its erroneous reliance on two cases from this court as supporting its determination that Kollar's invention was on sale within the meaning of § 102(b). In *Kollar I,* the Board cited *Scaltech Inc. v. Retec/Tetra, L.L.C.,* 178 F.3d 1378, 51 USPQ2d 1055 (Fed.Cir.1999), and *Petrolite Corp. v. Baker Hughes Inc.,* 96 F.3d 1423, 40 USPQ2d 1201 (Fed.Cir.1996), for the proposition that "[a] chemical process can be bought or sold by a commercial contract . . . to the extent that the buyer would be *supplied with information defining an embodiment* or embodiments of a process *and can use that information to use or practice the embodiment(s) of that process* in return

for consideration...." *Kollar I* at 34–35 (emphases added). Those cases, however, involved either the sale of a compound that was used commercially to perform the claimed process, *Petrolite*, 96 F.3d at 1426, 40 USPQ2d at 1204, or an offer to perform the process commercially for consideration, *Scaltech*, 178 F.3d at 1382, 51 USPQ2d at 1058, and not merely the transfer of a license to practice the invention coupled with "information defining an embodiment" of that invention. The Board later stated in *Kollar III* that a process is "physically represented by a written description in a document." *Kollar III* at 8. However, the issue concerning the on-sale bar is not whether the process is physically represented or enabled by a written description, but whether the process has been commercialized. The transmission of a written description of the process does not meet that test.

▮ We cannot articulate in advance what would constitute a sale of a process in terms of the on-sale bar. Surely a sale by the patentee or a licensee of the patent of a product made by the claimed process would constitute such a sale because that party is commercializing the patented process in the same sense as would occur when the sale of a tangible patented item takes place. *See D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147–48, 219 USPQ 13, 15–16 (Fed. Cir.1983) (holding that a sale by a patentee or an assignee of a product made by a claimed method before the critical date results in a "forfeiture" of any right to a

patent to that method, even though the sale of the product did not reveal anything about the method to the public); *see also W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550, 220 USPQ 303, 310 (Fed.Cir.1983) (same).[4] Actually performing the process itself for consideration would similarly trigger the application of § 102(b). *See Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 269 F.3d 1321, 1328, 60 USPQ2d 1687, 1691 (Fed.Cir.2001) (holding that a claim to a process for treating oil refinery waste was invalid under § 102(b) because the patentee offered to perform the claimed process more than one year before filing for a patent). These situations, however, are not before us. We hold only that licensing the invention, under which development of the claimed process would have to occur before the process is successfully commercialized, is not such a sale. Accordingly, because the Celanese Agreement did not involve the sale of a product of the claimed process, but rather provided Celanese with a license[5] to practice the claimed process and "information defining an embodiment" of that process, that agreement did not trigger the on-sale bar.

Finally, it is important to recognize that exempting licenses under a patent from the on-sale bar is not inconsistent with traditional policies underlying that doctrine, including:

(1) [the] policy against removing inventions from the public domain which the public justifiably comes to believe are freely available due to commercializa-

---

4. Although *D.L. Auld* and *W.L. Gore* involved the forfeiture of patent rights due to sales by patentees or assignees, we see no reason why that rule should not equally apply to licensees of those parties.

5. The fact that Celanese's license could potentially be exclusive or nonexclusive does not alter our analysis. Both types of licenses involve only rights under any future patent, and in neither case is a product of the claimed process actually offered for sale.

tion; (2)[the] policy favoring prompt and widespread disclosure of inventions to the public; and (3)[the] policy of giving the inventor a reasonable amount of time following sales activity to determine whether a patent is worthwhile.

*In re Caveney,* 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985) (citations omitted). First, the grant of a license in and of itself does not enable the public to justifiably believe that an invention is freely available because a license discloses the invention only to the licensee, usually (as in this case) with an accompanying confidentiality obligation, and does not involve an embodiment of the invention that is publicly available. Second, although exempting licenses under a patent from the on-sale bar may delay the occurrence of a potential § 102(b) triggering event that would force the inventor to file an application within one year therefrom, licenses in fact further the objective of making inventions available to the public by enabling inventors to place their inventions into the hands of parties that are in a better position to commercialize the invention and thus disclose it to the public. Many inventors do not have the resources to produce commercial embodiments of their inventions, and therefore the ability to license or assign without fear of triggering the on-sale bar facilitates providing the public with the benefit of their inventions under circumstances in which they might not otherwise have the ability or the incentive to do so. Lastly, although an inventor may economically benefit somewhat from licensing his invention at the time of granting the license, such as by up-front fees or advance royalties, the real benefit from commercializing an invention occurs when the invention is actually utilized commercially or made available to the public, and the grant of a license, albeit accompanied by some payment, is only part of the pre-commercialization process aimed at making the invention commercial. The on-sale bar is not implicated by such activities. The grant of a license thus does not conflict with the policies underlying the on-sale bar.

We therefore reverse the Board's conclusion that the examiner properly rejected the claims at issue under the on-sale bar. On remand, the Board may inquire whether Kollar, Redox, or any licensee of the invention (*e.g.,* Celanese or ARCO) forfeited Kollar's right to obtain a patent to the claimed process by offering for sale a product made using that process more than one year prior to filing the '564 application. *See D.L. Auld,* 714 F.2d at 1147–48, 219 USPQ at 15–16. The Board may also inquire whether the on-sale bar of § 102(b) applies on account of acts of any of the above-mentioned parties, or any third party, that commercially exploits the claimed process by offering to *actually perform* that process to commercially produce ethylene glycol or any other compound. *See Scaltech,* 269 F.3d at 1328, 60 USPQ2d at 1691.

Because we conclude that the Board erred in its basis for determining that the Celanese Agreement constituted a "sale" within the meaning of § 102(b), we need not address whether any activities undertaken by Celanese and/or Redox pursuant to that agreement fall within the experimental use exception to § 102(b).

## CONCLUSION

Because the Board erred in affirming the examiner's rejection of claims 1 through 17 under the on-sale bar of § 102(b), we

*VACATE AND REMAND.*