# United States Court of Appeals for the Federal Circuit

---

**BASF CORPORATION,**
*Plaintiff-Appellant*

**v.**

**SNF HOLDING COMPANY, FLOPAM INC., CHEMTALL, INC., SNF SAS, SNF (CHINA) FLOCCULANT CO. LTD.,**
*Defendants-Appellees*

---

2019-1243

---

Appeal from the United States District Court for the Southern District of Georgia in No. 4:17-cv-00251-RSB-BWC, Judge R. Stan Baker.

---

Decided: April 8, 2020

---

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC, argued for plaintiff-appellant. Also represented by GREGG LOCASCIO, SEAN M. MCELDOWNEY, CALVIN ALEXANDER SHANK; JAMES CHRISTOPHER MARTIN, Reed Smith LLP, Pittsburgh, PA; ROBERT RIDDLE, Houston, TX.

JAMES W. DABNEY, Hughes Hubbard & Reed LLP, New York, NY, argued for defendants-appellees. Also represented by EMMA L. BARATTA, STEFANIE MICHELLE GARIBYAN, PATRICE POLYXENE JEAN, RICHARD M. KOEHL,

DAVID E. LANSKY, MICHAEL M. POLKA; KHUE V. HOANG, Reichman Jorgensen LLP, New York, NY.

---

Before LOURIE, MOORE, and CHEN, *Circuit Judges*.

LOURIE, *Circuit Judge*.

BASF Corporation appeals from a decision of the United States District Court for the Southern District of Georgia, granting summary judgment that claims 1 and 3–7 of U.S. Patent 5,633,329 (the "'329 patent") are invalid as anticipated and that claim 2 is invalid as obvious. *See BASF Corp. v. SNF Holding Co.*, No. 4:17-cv-00251-RSB-BWC (S.D. Ga. Oct. 4, 2018), ECF No. 355 ("*Decision*"). The district court concluded that a process performed by a third party, Celanese Corporation's "Sanwet® Process," evidenced prior art knowledge and use of the patented invention within the meaning of 35 U.S.C. § 102(a), and further constituted both a public-use bar and an on-sale bar to the patented invention under 35 U.S.C. § 102(b).[1]

For the reasons set forth below, we disagree and hold that the Sanwet® Process does not create an on-sale bar to the '329 patent under § 102(b). We also conclude that the district court misinterpreted § 102(a) and the public-use bar of § 102(b), and that under the proper legal standard, genuine issues of material fact preclude the entry of summary judgment on those issues. Accordingly, the judgment of the district court is reversed, and the case is remanded for further proceedings.

---

[1] The '329 patent was filed in 1996 and issued in 1997, so pre-AIA 35 U.S.C. § 102 applies. *See* Leahy–Smith America Invents Act ("AIA"), Pub. L. No. 112–29, § 3(c), 125 Stat. 284, 293 (2011) (explaining that the pre-AIA version of the Patent Act generally applies to patents with effective filing dates before March 16, 2013).

## BACKGROUND

BASF owns the '329 patent, which is directed to an improved process for preparing high-molecular-weight polymers, specifically those synthesized by polymerization of water-soluble, monoethylenically unsaturated monomers. These polymers are used as super-absorbers in various fields, such as waste treatment, paper manufacturing, and mining. The '329 patent discloses that the polymers "are frequently of sticky consistency," col. 1 ll. 29–30, and adhere to the walls of the reactor. Prior art methods of discharging the reaction mixture through mechanical means, by injection of a separating liquid, or by injection of an inert gas had each proven unsatisfactory. *Id.* col. 1 ll. 14–64. Mechanical means of forcibly discharging the reaction mixture, like pistons, tended to damage the reactor walls; separating liquids contaminated the reaction mixture; and inert gas was ineffective because it would blow through gaps between the polymer mixture and the reactor wall. *Id.* col. 1 ll. 36–41, 55–64.

To solve this problem, the '329 patent discloses adding a conical taper with specific dimensions to the bottom end of a tubular reactor. The patent's drawing illustrates the invention:

D1 (in red) represents the diameter of the reactor, D2 (in green) represents the diameter of the end of the conical taper, and α represents the angle between D1 and the wall of the conical taper. The conical taper starts at D1 and ends at D2. Claim 1 is representative[2]:

> 1. A process for preparing high molecular weight polymers, which comprises polymerizing water-soluble, monoethylenically unsaturated monomers and, if desired, crosslinkers which contain at least two nonconjugated, ethylenically unsaturated double bonds in the molecule, and, if desired, water-insoluble monoethylenically unsaturated monomers in aqueous solution in the presence of polymerization initiators
>
> in a tubular reactor which has a conical taper at the end, the ratio of the diameter of the reactor (D1) to the diameter at the end of the conical taper of the reactor (D2) being from 2:1 to 25:1 and the angle between D1 at the start of the conical taper and the inner cone wall being >45° and <90°, and
>
> removing the gelatinous reaction mixture by injection of an inert gas.

In 2014, BASF filed a complaint in the United States District Court for the Southern District of Texas alleging infringement of the '329 patent by SNF Holding Company, Flopam Inc., Chemtall Inc., SNF SAS, and SNF (China) Flocculant Co. Ltd. (collectively, "SNF"). *See BASF Corp.*

---

[2]    While BASF argues claim 2 separately on the issue of obviousness in view of the Sanwet® Process, we do not reach that issue in deciding this appeal. We also do not reach BASF's argument that genuine issues of material fact preclude summary judgment of anticipation even in the event that the Sanwet® Process is prior art.

*v. SNF Holding Co.*, No. 4:14-cv-02733 (S.D. Tex. Sept. 23, 2014).[3]  SNF filed a petition in the U.S. Patent and Trademark Office for *inter partes* review of all claims of the '329 patent in January 2015, and the district court stayed this action.  The Patent Trial and Appeal Board then held in a final written decision that SNF failed to prove any claim unpatentable on the ground of obviousness, *SNF Holding Co. v. BASF Corp.*, No. IPR2015-00600, 2016 WL 8944638, at *10 (P.T.A.B. Aug. 2, 2016), and we affirmed, *SNF Holding Co. v. BASF Corp.*, 698 F. App'x 1034 (Fed. Cir. 2017).

After the Board's decision, SNF filed a motion for summary judgment of invalidity, asserting that the Sanwet® Process anticipates claims 1 and 3–7 and renders claim 2 obvious.  The Sanwet® Process was created in Japan by Sanyo Chemical Industries Ltd. to manufacture superabsorbent polymers.  Like the claimed invention, the Sanwet® Process is a method for manufacturing high-molecular-weight polymers by polymerizing water-soluble, monoethylenically unsaturated monomers in aqueous solution in the presence of polymerization initiators.

In 1985, Sanyo and Celanese entered into a license agreement that provided Celanese with an exclusive license to make, use, and sell certain of Sanyo's superabsorbent polymers in the Americas.  In addition, Sanyo furnished Celanese with extensive technical information about the Sanwet® Process, dispatched technical personnel to assist Celanese with plant start-up, and guaranteed that Celanese's Portsmouth, Virginia, plant would achieve the same performance as Sanyo's own plant in Japan.  Celanese was obligated to protect the secrecy of Sanyo's

---

[3]    In December 2017, the United States District Court for the Southern District of Texas granted SNF's motion to transfer venue to the United States District Court for the Southern District of Georgia.

confidential information for ten years and was only allowed to disclose such information to its employees and subcontractors to the extent necessary to build and operate the plant. These employees and subcontractors were in turn required to sign confidentiality agreements. The license was paid up as of 1995, and the agreement terminated in 1997.

In its summary judgment order, the district court agreed with SNF that "one person's use or knowledge" is all that is required for an invention to be "known or used" by others under § 102(a), and "whether prior use is secret or confidential is immaterial." *Decision*, slip op. at 22–23. Under that standard, it found no genuine dispute that the Sanwet® Process was known and used in the United States by Celanese, Hoechst AG—which acquired Celanese in 1987—and agents of Celanese, Hoechst, and Sanyo, as evidenced by the technical information Sanyo provided Celanese and the extensive operation of the Portsmouth plant before the '329 patent's priority date of January 31, 1995. *Id.* at 24–25.

The district court also granted summary judgment of invalidity on both the public-use and on-sale bars of § 102(b).[4] It found no genuine dispute that Celanese commercially exploited the Sanwet® Process before the critical date, and that its use was "in many respects accessible to the public." *Decision*, slip op. at 28–29 (noting that Celanese and Hoechst gave tours of the Portsmouth plant and that a newspaper article depicted the plant's interior). For the on-sale bar, the district court concluded that the license agreement, together with Sanyo's technical information and in-person operations assistance, amounted to a sale, rather than just a license, because "the transmission of the

---

[4]    The district court dismissed as moot BASF's cross-motion for partial summary judgment of validity. *Decision*, slip op. at 35.

process description to a user with the ability to perform the process constitutes putting the process 'on-sale.'" *Id.* at 30–31 (citing *Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1378 (Fed. Cir. 2003)).

This appeal followed.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

We review a district court's grant of summary judgment according to the law of the regional circuit. *Kaneka Corp. v. Xiamen Kingdomway Grp.*, 790 F.3d 1298, 1303 (Fed. Cir. 2015) (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1377 (Fed. Cir. 2014)).  In the Eleventh Circuit, summary judgment is reviewed *de novo*, considering all evidence in the light most favorable to the nonmoving party. *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (citing *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012)).  Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  But "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Patent invalidity is an affirmative defense to an action for infringement.  35 U.S.C. § 282(b).  The statutory presumption of patent validity imposes the burden of persuasion on the defendant, *id.* § 282(a), and factual propositions and inferences underlying an invalidity defense must be proven by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

Pre-AIA 35 U.S.C. § 102 sets forth several conditions of patentability, including novelty (subsections (a), (e), (f), and (g)) and loss-of-right provisions which may,

notwithstanding the novelty of an invention, bar a patent, *id.* (subsections (b), (c), and (d)).  It provides that "[a] person shall be entitled to a patent unless," *inter alia*, "(a) the invention was known or used by others in this country" before the applicant's invention, or "(b) the invention was . . . in public use or on sale in this country" more than one year before the applicant's filing date.  Anticipation is a question of fact, *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1357 (Fed. Cir. 2019) (citing *In re Gleave*, 560 F.3d 1331, 1334–35 (Fed. Cir. 2009)), but our interpretation of the Patent Act is a question of law, *see, e.g.*, *Power Integrations, Inc. v. Semiconductor Components Indus., LLC*, 926 F.3d 1306, 1313–14 (Fed. Cir. 2019) (citing *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 1376, 1379 (Fed. Cir. 2016)).

## I.  § 102(a) Prior Knowledge or Use

BASF first argues that the district court misinterpreted the phrase "known or used" in § 102(a) and erroneously disregarded the confidentiality of Celanese's knowledge and use.  In BASF's view, knowledge or use that is not publicly accessible does not qualify as prior art under § 102(a), and knowledge or use protected by confidentiality obligations is not publicly accessible.  Because confidentiality agreements applied to both the technical information Sanyo provided Celanese concerning the Sanwet® Process and Celanese's performance of that process in the Portsmouth plant, BASF contends that neither is available as evidence of prior art knowledge or use.

SNF responds that it has long been held that a single person's knowledge or use is sufficient to defeat novelty.  *See* Appellee Br. at 8–9 (citing *Gayler v. Wilder*, 51 U.S. (10 How.) 477, 498 (1850); *Coffin v. Ogden*, 85 U.S. (18 Wall.) 120, 124–25 (1873); *UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1289–91 (Fed. Cir. 2019)).  As a result, SNF argues, the existence of a confidentiality restriction, or any

other injunction of secrecy, upon those having knowledge of the invention is "simply extraneous." Appellee Br. 30.

We agree with BASF that the district court's interpretation of § 102(a) was erroneous. This court has uniformly interpreted the "known or used" prong of § 102(a) to mean "knowledge or use which is accessible to the public." *Carella v. Starlight Archery & Pro Line Co.*, 804 F.2d 135, 139 (Fed. Cir. 1986); *accord Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) (quoting *Carella*, 804 F.2d at 139), *and Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1306 (Fed. Cir. 2002).

Our understanding traces back to our predecessor court, *see In re Borst*, 345 F.2d 851, 854 (CCPA 1965), which, in turn, derived its precedent from decisions of the Supreme Court, including *Coffin* and *Gayler*, and took guidance from renowned holdings of one of our sister circuits, *see, e.g.*, *Metallizing Eng'g Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir. 1946) (Hand, J.); *Gillman v. Stern*, 114 F.2d 28 (2d Cir. 1940) (Hand, J.).

The Patent Acts of 1790, ch. 7, § 1, 1 Stat. 109, 110, and 1793, ch. 11, § 1, 1 Stat. 318, 319, created the original novelty requirement: that an invention could not be patented if it had been previously "known or used." In *Pennock v. Dialogue*, 27 U.S. (2 Pet.) 1 (1829), the Supreme Court confronted the practical difficulties of treating the conduct of inventors and third parties equivalently for the purposes of novelty. A strict construction of "known or used" would apply to the inventor's own pre-filing knowledge and use, as well as that of the people he engaged to assist him. Thus, a patent's novelty would often be defeated by its own reduction to practice. To avoid such a result, the Court interpreted "known or used" as implicitly limited to knowledge or use "by the public," *id.* at 19, which was later codified in the Patent Act of 1836 as "by others," before the date of invention. Ch. 357, § 6, 5 Stat. 117, 119.

The Supreme Court recognized, however, that its interpretation created a new problem. If the inventor's knowledge and use were so exempted, he could publicly use and sell his invention until "the danger of competition should force him to secure the exclusive right," thereby extending his effective exclusivity beyond the term provided by the statute. *Pennock*, 27 U.S. (2 Pet.) at 19. *Pennock* exemplifies that problem; there, the inventor publicly used and sold his invention for seven years before filing a patent application. *Id.* at 8. As a result, the Supreme Court interpreted the novelty requirement to also bar an inventor who publicly used or sold his invention from later obtaining a patent. *Id.* at 23–24 ("[The inventor's] voluntary act or acquiescence in the public sale and use is an abandonment of his right . . . ."). Congress codified this distinction between novelty and statutory bars in the Patent Act of 1836. Under that act, public use or sale of the invention before the inventor's filing date barred a patent, but only if done "with [the inventor's] consent or allowance." Ch. 357, § 6, 5 Stat. 117, 119. This provision was later modified to apply to public-use or on-sale activities of other parties as well. *See* Patent Act of 1870, ch. 230, § 24, 16 Stat. 198, 201; *see also Andrews v. Hovey*, 123 U.S. 267, 274 (1887).

SNF contends that, by knowledge or use "accessible to the public," *Gayler*, 51 U.S. (10 How.) at 497, the Supreme Court meant "existing" knowledge of any kind, secret or not, Appellee Br. 24, and provided an exception to the normal rule that a patentee must be the first inventor only in the rare circumstance where the prior knowledge and use had been forgotten at the time of the patentee's invention.

We disagree. In *Gayler*, the Supreme Court affirmed a jury verdict for the patentee of no prior use or knowledge where the prior user "had not made his discovery public, but had used it simply for his own private purpose." 51 U.S. (10 How.) at 496. It held that the jury's finding that the prior user's device was "finally forgotten or abandoned" defeated the defendant's prior knowledge and use defense

because the patentee was similar to "the discoverer of a lost art," and "whatever benefit any individual may derive from [the invention] . . . , he owes entirely to [the patentee]." *Id.* at 497–98.

*Gayler* has long been held to rest on a broader principle than SNF advances: that one who invents something previously known or used in a literal sense, but which has been forgotten, abandoned, concealed, or otherwise "lost," is the first to "enrich[] the art" by his disclosure and is therefore the original inventor. *Gillman*, 114 F.2d at 31. Prior knowledge or use that is not accessible to the public "upon reasonable inquiry," *Gayler*, 51 U.S. (10 How.) at 497, confers no benefit on the public, and thus does not suffice as a defense under § 102(a). In drafting the Patent Act of 1952, ch. 950, 66 Stat. 792, Congress "recogniz[ed] that the interpretation [of § 102(a)] by the courts excludes various kinds of private knowledge not known to the public." H.R. Rep. No. 82-1923, at 6 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394, 2399; *see also* P.J. Federico, *Commentary on the New Patent Act* (1954), 35 U.S.C.A. 1 (West 1954), *reprinted in* 75 J. PAT. TRADEMARK OFF. SOC'Y 161, 178 (1993) (noting that Congress did not intend to change these "narrowing interpretations"). Our precedent is in accordance with these authorities. *See Woodland Tr.*, 148 F.3d at 1370.

SNF is correct that "[p]rior knowledge and use by a single person is sufficient." *UCB*, 927 F.3d at 1289 (quoting *Coffin*, 85 U.S. (18 Wall.) at 124). But "[t]he number is immaterial," *Coffin*, 85 U.S. (18 Wall.) at 125, and where the prior user has successfully concealed his work from the public, such prior knowledge or use is unavailable as prior art because the prior user has "not contributed to the store of knowledge" in the art, *Woodland Tr.*, 148 F.3d at 1370. As we have noted in the context of the § 102(b) public-use bar, both the existence of relevant confidentiality agreements and the degree to which they were honored are evidence of whether prior knowledge and use were accessible to the public but are not necessarily conclusive. *See, e.g.*,

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed. Cir. 2004) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed. Cir. 1986), *overruled-in-part on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc)).

The parties dispute the extent to which Sanyo's technical information and the performance of the Sanwet® Process at the Portsmouth plant were actually subject to confidentiality restrictions. SNF also argues that no evidence suggests Sanyo's employees, who were sent to the United States to assist in the Portsmouth plant's launch, were subject to the confidentiality obligations imposed on Celanese, its employees, and its agents. We conclude that the record reveals genuine issues of material fact as to whether the Sanwet® Process was "known or used" within the meaning of § 102(a), as set forth above.[5] We therefore reverse the district court's summary judgment of invalidity and remand for a determination of SNF's § 102(a) defense at trial.

## II.  § 102(b) Public Use

BASF also argues that the district court's summary judgment on public use was in error. Specifically, BASF contends that the district court misinterpreted the public-use bar of § 102(b) to apply to a third party's secret commercial use. BASF also maintains that the district court's other basis for its decision—that Celanese's use of the Sanwet® Process was not, in any event, secret—was erroneous because the record does not establish that members of the public could observe every step of the Sanwet® Process on tours Celanese gave of the Portsmouth plant or that it

---

[5]  Our reversal of the district court's summary judgment decision on public use, *infra*, cites additional genuine issues of material fact that may also bear upon the factfinder's evaluation of SNF's § 102(a) defense.

could get such information from the newspaper articles the district court cited.

SNF responds that Celanese's use of the Sanwet® Process was public under the holding of *Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939) ("The ordinary use of a machine or . . . process in a factory in the usual course of producing articles for commercial purposes is a public use."). SNF further contends that a third party's secret commercial use is a public-use bar regardless of its accessibility to the public.

We agree with BASF. In *Shimadzu*, the Supreme Court explained that the public-use bar applies to uses of the invention "not purposely hidden" and held that the use of a process in the ordinary course of business—where the process was "well known to the employees" and no "efforts were made to conceal" it from anyone else—is a public use. *Id.* at 20–21. In our public-use cases, we have applied the rule of *Shimadzu* to assess whether a use was successfully concealed or hidden and therefore inaccessible to the public. *See, e.g.*, *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1384–85 (Fed. Cir. 2007); *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1382 (Fed. Cir. 2005); *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548–50 (Fed. Cir. 1983). If the use identified by the defendant was not successfully concealed or hidden from those who lack any "limitation or restriction, or injunction of secrecy," *Egbert v. Lippmann*, 104 U.S. (14 Otto) 333, 336 (1881), then it is a public use within the meaning of § 102(b). *But see, e.g.*, *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 133–37 (1877) (experimental use is not public use).

The parties disagree whether Celanese's use of the Sanwet® Process meets this standard. The district court cited evidence that Celanese had given tours of the Portsmouth plant to local officials, potential customers, and

members of the public and that newspaper articles and a commemoration video depicted the interior of the plant. *Decision*, slip op. at 28. BASF principally contends that, while certain elements of the claimed process were unquestionably made public—such as the shape of the conical taper—the rest were not, precluding a finding of public use. SNF responds that Celanese failed to fully conceal the process, which qualifies as public use as a matter of law.

We conclude that the district court erred in finding, on summary judgment, that the claimed process was publicly accessible. As an initial matter, we disagree with BASF that public use under § 102(b) requires a finding that the public was made aware of every limitation of the claimed process. Our precedent is clear that a factfinder should consider whether certain elements of the claimed invention were already in the public domain at the time of the alleged public-use or on-sale activity. Thus, we have held that § 102(b) "does not require a strict identity between the claimed invention and the device involved in the public use or on sale activities;" it only requires that "the differences between the claimed invention and the device used or sold would have been obvious to one skilled in the art." *In re Smith*, 714 F.2d 1127, 1137 n.13 (Fed. Cir. 1983) (citing *In re Corcoran*, 640 F.2d 1331, 1333 (CCPA 1981)); *see also In re Blaisdell*, 242 F.2d 779, 783 (CCPA 1957) (finding public use even where some elements of the invention are by their nature concealed from view) (citing *Hall v. Macneale*, 107 U.S. (17 Otto) 90, 96–97 (1883)).

But, on this record, genuine issues of material fact prevent entry of summary judgment on SNF's public-use defense. Neither party disputes that members of the public were given access to the Portsmouth plant on numerous occasions, where they could view the shape of the conical taper, and that no evidence suggests that any of these guests was a skilled artisan. The parties dispute whether the remaining elements of the Sanwet® Process were known, and to the extent they were not, whether they were concealed

from the public on these tours, in newspaper articles, and in the commemoration video.  While the public-use inquiry is often context-specific, we have identified factors which may, in a given case, prove relevant.  *See, e.g.*, *Dey, L.P. v. Sunovion Pharm., Inc*, 715 F.3d 1351, 1355–56 (Fed. Cir. 2012) (the nature of the activity that occurred in public, public access to and knowledge of the public use, existence of an actual or implied confidentiality obligation, and the relevant skill and knowledge of observers (citations omitted)).  A factfinder would be entitled to make reasonable inferences about these activities in deciding whether Celanese's use of the Sanwet® Process was a public use, and summary judgment is therefore improper.  *See id.* at 1357 ("The 'public use' inquiry is replete with factual considerations . . . ."); *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1327 (Fed. Cir. 2019) (acknowledging that the jury is permitted to make reasonable inferences about public accessibility and confidentiality).

SNF's second contention—that a third party's commercial exploitation of a secret process creates a *per se* public-use bar to another inventor—is simply wrong.  In *Gore*, this court held that a third party's sale of products made by a secret process, more than one year before the critical date, does not create a bar to another inventor patenting the process.  721 F.2d at 1550 (citing *Metallizing*, 153 F.2d 516).

In *Metallizing*, the defendant raised a public-use defense based on the patentee's earlier commercial exploitation of his then-secret process.  Judge Learned Hand, writing for the Second Circuit, recognized that a secret process was neither "publicly" used, nor itself on sale, under a literal construction of § 102(b).  Nevertheless, he reasoned that an inventor's commercial exploitation of the secret process squarely implicated the Supreme Court's rationale for creating the statutory bars in the first place, *see Pennock*, 27 U.S. (2 Pet.) 1, and that the statute would be frustrated were such an exception recognized.  *Metallizing*, 153 F.2d at 519–20.  Thus, the Second Circuit held that an

inventor's commercial exploitation of his invention before the critical date created a public-use bar—"regardless of how little the public may have learned about the invention." *Id.* at 520 ("[I]t is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly."). At the same time, *Metallizing* reaffirmed the holding of *Gillman*, 114 F.2d at 30–31, that such exploitation by a third party does not create a public-use bar. 153 F.2d at 518–19. The *Metallizing* rule was subsequently adopted as precedent by this court in *Gore*, 721 F.2d at 1550. [6] *See also Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 68–69 (1998) (citing the *Metallizing* rule); *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 149 (1989) (same).

Nevertheless, SNF argues that *Metallizing* forfeiture is equally applicable to third-party secret uses, citing our decision in *Invitrogen Corporation v. Biocrest Manufacturing, L.P.*, 424 F.3d 1374 (Fed. Cir. 2005). SNF is mistaken. *Invitrogen* concerned a patentee that had used its process for internal purposes before seeking a patent. We reversed the district court's finding of public use because the process had been successfully concealed until after the critical date. *Id.* at 1379. We also noted that the *Metallizing* rule was inapplicable in that case because the record showed that Invitrogen never commercially exploited the process or

---

[6]    Unsurprisingly, given its judicial provenance, the *Metallizing* rule has been variously applied by this court as a public-use bar and as an on-sale bar. *Compare Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 390 (Fed. Cir. 1984) (public-use), *with Quest Integrity USA, LLC v. Cokebusters USA Inc.*, 924 F.3d 1220, 1227 (Fed. Cir. 2019) (on-sale). For the purposes of this appeal, we treat it as the district court did—as a public-use bar.

attempted to do so. *Id.* at 1382–83. *Invitrogen* did not concern third-party public use at all.[7]

Moreover, as we reasoned in *Gore*, extending the *Metallizing* rule to third-party public use, as SNF urges, is inconsistent with § 102(b). The primary reasons for the statutory bars are to prevent the public from being deprived of that which it has come to rely on as publicly available, to encourage prompt disclosure of inventions, and to prevent effective extension of patent term by gamesmanship. *See TP Labs., Inc. v. Prof. Positioners, Inc.*, 724 F.2d 965, 968 (Fed. Cir. 1984). The *Metallizing* rule as it stands fulfills the latter two imperatives, and it is not inconsistent with the first because a secret process is not in the public domain in the first place. *See, e.g.*, *Gore*, 721 F.2d at 1550 (patent law favors the later inventor who shares his knowledge with the public over the prior inventor who conceals his invention).[8]

---

[7]    SNF also misreads *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577 (Fed. Cir. 1986), to conflict with *Gore*. In that case, we held only that a third party's secret sale of a device created an on-sale bar to a later inventor's patent on the same device—an unremarkable proposition, *see, e.g.*, *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 139 S. Ct. 628 (2019).

[8]    It also appears that Congress has considered the implications of patenting secret processes, which prior innovators might often choose to conceal as trade secrets, and addressed the issue. As part of the AIA, § 5, 125 Stat. 284, 297–99, Congress revised 35 U.S.C. § 273 to create a prior-use defense for a defendant that "commercially used" a claimed "process" or "machine, manufacture, or composition of matter used in a manufacturing or other commercial process" "at least 1 year" before the earlier of the effective filing date of the claimed invention or a previous disclosure

In summary, we reverse the district court's summary judgment of invalidity and remand for determination of SNF's public-use defense at trial.

### III. § 102(b) On Sale

BASF further requests reversal of the district court's decision on SNF's § 102(b) on-sale defense. It argues that the agreement between Sanyo and Celanese to license the Sanwet® Process was not a sale under *In re Kollar*, 286 F.3d 1326 (Fed. Cir. 2002). BASF further denies that Hoechst's acquisition of Celanese in 1987, including the operational Portsmouth plant, constitutes a sale of the process.

SNF responds that the facts of this case differ from those in *Kollar*. It emphasizes that the Sanwet® Process was fully operational at the time of the license and Sanyo was contractually obligated to help Celanese meet performance guarantees for the Portsmouth plant. SNF submits that *Minton*, 336 F.3d 1373, cited by the district court, held that the on-sale bar applies to a conveyance of a product that enables the recipient to perform a later-claimed process, and it argues that *Minton* controls this case. Alternatively, SNF argues that we should affirm the district court's judgment because Hoechst's acquisition of Celanese separately placed the Sanwet® Process on sale.

We agree with BASF that the district court's judgment must be reversed. Neither the Sanyo-Celanese license agreement nor the 1987 Hoechst acquisition of Celanese is a sale of the invention within the meaning of § 102(b).

An invention is "on sale" under § 102(b) when it is "the subject of a commercial offer for sale," and is ready for patenting. *Pfaff*, 525 U.S. at 67. The invention itself must be sold or offered for sale, and the mere existence of a

---

thereof. A successful prior-use defense, however, does not necessarily establish invalidity. 35 U.S.C. § 273(g).

"commercial benefit . . . is not enough to trigger the on-sale bar" on its own. *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1373 (Fed. Cir. 2016) (en banc). To determine whether such a commercial sale or offer for sale has occurred, we look to how those terms are defined in the Uniform Commercial Code. *Id.* at 1365, 1375 ("[T]he Uniform Commercial Code describes a 'sale' as 'the passing of title from the seller to the buyer for a price.' U.C.C. § 2-106(1)."); *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) ("[A] commercial offer for sale [under § 102(b) is] one which the other party could make into a binding contract by simple acceptance (assuming consideration) . . . .").

But we have often recognized that "[a] process, however, is a different kind of invention; it consists of acts, rather than a tangible item," *Kollar*, 286 F.3d at 1332, as is contemplated by the U.C.C.'s definition of sale. Yet, in certain circumstances, a process may be sold in a manner which triggers the on-sale bar. For example, performing the process itself for consideration is sufficient. *See Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328–29 (Fed. Cir. 2001) (offer to perform process for treating oil refinery waste placed the invention on sale). So is a patentee's sale of a product made by his later-patented process, *i.e.*, the *Metallizing* rule. *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147–48 (Fed. Cir. 1983) (applying the *Metallizing* rule as an on-sale bar).

In *Kollar*, this court decided that a chemical process for preparing peroxides was not placed on sale by the patentee's contract with Celanese, which called for Kollar to license his future patents covering the invention, provide Celanese with technical "know-how" for implementing the process, and to coordinate possible future commercialization, in exchange for a royalty. We first explained that no products made using Kollar's process had ever been sold or offered for sale, and, as a result, potential plans to commercialize the invention in the future were irrelevant. 286

F.3d at 1330–31.  Absent such a forfeiture, *D.L. Auld*, 714 F.2d 1144, the arrangement amounted to an ordinary license agreement.  Thus, the holding of *Kollar* rested on the well-established principle that the grant of a license to practice a patented invention, with or without accompanying technical information, does not itself create an on-sale bar.  *Id.* at 1333; *see Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1216–17 (Fed. Cir. 1998); *Moleculon*, 793 F.2d at 1267.

Shortly thereafter, we decided *Minton*, which concerned a computer system programmed to facilitate securities trading and methods of doing so using the claimed system.  We held there that, unlike the transaction at issue in *Kollar*, Minton's lease of his trading system to a local brokerage firm raised an on-sale bar against his method claims because the system substantially "embod[ied] the claimed method."  336 F.3d at 1378; *see also J.A. LaPorte*, 787 F.2d at 1583.

As the Supreme Court observed, in the context of the patent exhaustion doctrine, a product and methods of using that product "may approach each other so nearly that it will be difficult to distinguish the process from the function of the apparatus." *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 629 (2008) (quoting *United States ex rel. Steinmetz v. Allen,* 192 U.S. 543, 559 (1904)).  In that circumstance, where a product "embodie[s] essential features of [the] patented invention," *Quanta*, 553 U.S. at 632 (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249–51 (1942)), a sale of the product is tantamount to a sale of the process performed by that product and thus creates an on-sale bar to the process claims as well.  *See Minton*, 336 F.3d at 1377–78.

Under these precedents, it is clear that *Kollar* governs this case.  The Sanyo-Celanese agreement provided Celanese with a license to practice the Sanwet® Process, exhaustive technical information about performing it, and

the in-person assistance of Sanyo's employees. This agreement differs from Kollar's license agreement with Celanese only to the extent that Sanyo might have provided Celanese with more assistance to enable it to perform the claimed process, but it was not a sale of the Sanwet® Process.

The district court's error arose from its misunderstanding of our holding in *Minton*—as does SNF's for that matter. As we explained above, *Minton* did not hold that transmitting information about an operative process to enable a licensee to perform it invokes the on-sale bar. The on-sale bar does not turn on whether or not the patentee's process information and assistance are helpful to the licensee or whether the licensee is capable of performing the licensed process. Unlike in *Minton*, the essential features of the claimed process here were not embodied in a product sold or offered for sale before the critical date.

Finally, we reject SNF's argument for its alternative ground of affirmance. Hoechst's acquisition of Celanese did not create an on-sale bar for the same reason that the Sanyo-Celanese license did not: there was no product sold as part of the transaction that embodied the essential features of the Sanwet® Process. While SNF argues that either the Portsmouth plant itself or the plant's equipment used to perform the Sanwet® Process is such a product, we disagree. The record contains no indication that the equipment substantially embodies the claimed process; indeed, SNF's declarant asserted that the reactors used were "conventional polymerizing vessel[s]." J.A. 4219. In other words, the equipment was capable of numerous uses apart from its use in the Sanwet® Process and therefore does not substantially embody the essential features of the '329 patent claims. *See Quanta*, 553 F.3d at 631–32. It follows, *a fortiori*, that neither does the entire Portsmouth plant or all of Celanese as it existed before its acquisition by Hoechst. For a typical acquisition such as this, the purchase of a company is not, under the patent law,

tantamount to a purchase, or in inverse terms a sale, of every asset held by the acquired company. *See Micro-Magnetic Indus., Inc. v. Advance Automatic Sales Co.*, 488 F.2d 771, 772–73 (9th Cir. 1973).

We reverse the district court's decision and hold that the '329 patent claims are not invalid under the on-sale bar of § 102(b).

## CONCLUSION

We have considered the parties' remaining arguments but find them unpersuasive. Because the district court misinterpreted § 102(a) prior knowledge and use, as well as the public-use bar of § 102(b), we reverse its summary judgment and remand for trial on those defenses. We also reverse the district court's summary judgment on SNF's on-sale bar defense and direct entry of partial summary judgment for BASF on that issue. Accordingly, the judgment of the district court is

## REVERSED AND REMANDED

### COSTS

Costs to BASF.